THE UNITED STATES DISTRICT COURT
THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


EDNA D. MACK,

          Plaintiff,                        Case No. 06-14365

vs.

MICHAEL J. ASTRUE,                HONORABLE ROBERT H. CLELAND
COMMISSIONER OF SOCIAL SECURITY    HONORABLE STEVEN D. PEPE

          Defendant.


## REPORT AND RECOMMENDATION

### I.    BACKGROUND

Edna D. Mack brought this action under 42 U.S.C. § 405(g) and § 1383(c)(3) to challenge a final decision of the Commissioner denying her application for Disability Insurance Benefits (DIB) under Title XVI of the Social Security Act. Both parties have filed motions for summary judgment, which have been referred pursuant to 28 U.S.C. § 636(b)(1)(B) and (C). For the following reasons, IT IS RECOMMENDED that Plaintiff's Motion for Summary Judgment be DENIED, and Defendant's Motion for Summary Judgment be GRANTED.

### A.    Procedural History

On March 23, 2004, Plaintiff filed an application for DIB, claiming she became disabled following a car accident on October 7, 2003, due to left knee, back and neck pain (R. 11, 38, 289-95). Plaintiff's claim was denied upon initial review (R. 21), and she requested an administrative hearing. At an April 7, 2006, hearing, Plaintiff was

1

represented by her current attorney William W. Watkinson and Vocational Expert ("VE") Richard Szydlowski also testified (R. 11). ALJ Edward C. Graham issued an April 27, 2006, opinion, concluding that Plaintiff was not disabled because she retained the ability to perform a significant range of light work, despite her impairments (R. 15).

### B. Background Facts

#### 1. Plaintiff's Testimony

##### *April 2004 Disability Application*

On April 16, 2004, Plaintiff completed a Work History Report, indicating she had previously worked as a maid and a waitress in 2003 (R. 57). She completed a Function Report the same day, which indicated that her insurance company paid for an attendant to help her with cleaning and taking care of her two-year-old son (R. 66). She did not do any of the household chores, though she did go grocery shopping with help (R. 68). She could only prepare food that did not require her to stand for a long period of time (R. 67). Because she no longer drove, Plaintiff had to find rides to get to her daily doctor appointments (R. 68). She enjoyed reading and watching television, though pain in her neck and back prevented her from sitting for long periods of time (R. 69).

Plaintiff stated that she was unable to lift, squat, stand, reach, walk, sit or climb stairs because of the pain and strain to her knee, neck and back (R. 70). She used a prescription knee brace for walking and estimated that she could walk two blocks before having to stop and rest (R. 70-71). She further estimated that she would have to rest for 15 minutes before she could begin walking again (R. 71).

Plaintiff was 42 years old at the time of the hearing (R. 288).  She was 5'5" tall, and, though she stated her normal weight was 140 pounds, she weighed 170 pounds.  She had a high school education and no other vocational training (R. 299).

She testified that on October 7, 2003, she was involved in a car accident, suffering injuries to her left knee, neck and back (R. 289).  Plaintiff saw Dr. Policherla at Pointe Neurology for her neck and back injuries, and Dr. Glowacki, an orthopedic surgeon, for her left knee injury (R. 294).

Her left knee injury caused her the most significant difficulties (R. 289).  It was unstable, sometimes gave out, and had caused her to fall (R. 290, 292).  Pain and swelling became worse when she stood or walked for long periods of time (R. 290).  Unlike the two blocks in listed in her 2004 application, Plaintiff estimated at her 2006 hearing that she could walk for half a block before pain would force her to sit or lie down (R. 292).  Elevating her knee helped with the pain. Over an eight hour period, she estimated she would need to lie down for four hours.  She needed to use the hand rails when going up or down stairs and had difficulty walking on uneven ground.

To treat her knee injury, she took Motrin for the pain and participated in physical therapy, including hot and cold treatments and knee exercises (R. 293).  Plaintiff stated she could not return to her job as a maid because she was unable to bend and stoop (R. 297-98).  She thought she had seen some improvement in her condition due to therapy, "every time [she] take[s] a step, it seems like [she's] taking two steps back."  Dr. Glowacki discussed the possibility of surgery with her, but because of the lack of

guarantee of success, particularly considering her age, she had not agreed to it (R. 294).

The ALJ asked her more about her refusal:

> ALJ: I don't understand why you haven't undergone it. I've had meniscus tear surgery. I've had problems walking after I had surgery. You know, after a reasonable amount of time I could walk. The doctor seems to recommend it. I just want to know why you haven't done it . . . .
>
> PLAINTIFF: I'm scared.
>
> ALJ: What? Scared? That's your answer?

(R. 299-300).

Plaintiff also testified about her neck and back injuries (R. 294-297). She felt a "very painful sharp pain" that extended down both legs to her toes (R. 295). She could only sit up for a few minutes, and then pain would force her to recline back (R. 296). Because of the pain in her back, she had difficulties walking and lifting weight (R. 297). She estimated that she could lift five pounds.

She noted that her sister did all the household chores (R. 298). While she might leave the house "every now and again" to get some air or go to the doctor, she was no longer able to drive and spent her days sitting and watching television (R. 298-99).

### 2.  **Medical Evidence**

#### *Evidence Received Prior to the Hearing*

Following her car accident on October 7, 2003, Plaintiff was taken to an emergency room where she was diagnosed with neck and lumbar strain and prescribed medication (R. 80-86). Lumbosacral and cervical spine x-rays showed evidence of mild degenerative disc disease in the lower thoracic spine, but normal intervertebral disc spaces and no lesions (R. 86).

4

On October 10, 2003, neurologist Haranath Policherla, M.D., A.C.P., examined Plaintiff (R. 127). She complained of headaches, neck pain radiating to the top of her head, low back pain radiating to the lower extremities and dizziness. Her sensation and reflexes were normal, except at the toes (R. 128). Strength in all extremities was normal (R. 127). Dr. Policherla prescribed medication and physical therapy. The physical therapy began on November 3, 2003; Plaintiff was seen five to six times each month until May 3, 2004 (R. 92-126).

On October 30, 2003, Plaintiff underwent nerve conduction and EMG studies (R. 129-31). Dr. Policherla reported that the studies showed bilateral C5-C6 radiculopathy and lumbar radiculopathy (R. 131). A November 1, 2003, EEG was mildly abnormal indicative of diffuse disturbance of cerebral function because of slowing of background activity (R. 125).

Dr. Policherla saw Plaintiff on November 20, 2003, January 8, 2004, and February 23, 2004 (R. 107, 116, 122). Plaintiff complained of headaches, dizziness and back pain and was prescribed medication and physical therapy (R. 107, 116, 122).

On November 24, 2003, orthopedic surgeon Stefan Glowacki, M.D., P.C., examined Plaintiff (R. 156). She complained that her left knee was unstable and sometimes gave way or popped out. She also complained that she had difficulties walking, standing and squatting, and that she was experiencing swelling. Dr. Glowacki noted that she walked with some limp on the left side, could not squat or stand up on her left leg and had difficulty walking on her heels and toes. He also reported atrophy of the quadriceps muscle. Dr. Glowacki diagnosed torn medial collateral ligament and anterior

cruciate ligament, ordered an MRI and prescribed physical therapy and a knee brace (R. 157).

On December 2, 2003, the MRI on Plaintiff's left knee revealed a frank tear of the anterior cruciate ligament, significant lateral compartment narrowing with degenerative subchondral cysts and thinning of the articular cartilage with tears of the lateral meniscus, tear of the inner portion of the posterior horn of the medial meniscus (R. 154-155). There also was concern for sprain vs. partial tear of the fibular collateral ligament, mild sprain of the medial collateral ligament and mild medial collateral ligament bursitis, and degenerative changes of the knee (R. 154-55).

On December 3, 2003, Plaintiff began physical therapy on her left knee (R. 173, 175). She was treated one to three times a week until June 21, 2004 (R. 160-78, 227-41). At the first visit, left knee flexion was 130 degrees, extension was reduced, strength in the lower left extremity was fair to good, sensation was normal and she walked independently with a slightly antalgic gait pattern (R. 175-76). On a scale of one to ten, Plaintiff measured her pain at eight (R. 175).

A January 27, 2004, physical therapy evaluation showed 125 degrees of left knee flexion and reduced extension (R. 169). Strength in the left lower extremity was fair to good, sensation was normal, and Plaintiff walked independently wearing a knee brace with an antalgic gait pattern (R. 169-70). Plaintiff had moderate difficulties getting up from lower chairs and the floor and measured her pain at nine out of ten.

At her March 5, 2004, physical therapy evaluation, Plaintiff had normal left knee flexion and extension (R. 163). Strength in the left lower extremity was fair to good, sensation was normal and Plaintiff walked with a minimal limp on the left leg. Plaintiff

had moderate difficulty getting up from lower chairs and from the floor (R. 164). She measured her pain at six out of ten. On April 7, 2004, she could flex her knee 140 degrees and measured her pain at five out of ten (R. 233).

On April 16, 2004, Dr. Glowacki examined Plaintiff, and reported that she walked with a limp on the left lower extremity, was not able to squat, and could not stand or hop on the left leg. Further, he noted she was not able to walk on her heels and toes or walk heel to toe. There was visible atrophy of her quadriceps. Her left knee flexion was reduced and she complained of pain on passive range of motion and active flexion. She had difficulty standing, walking, carrying, sitting down and getting up from a seated position (R. 151). Dr. Glowacki stated that she would most likely need total knee replacement, and that presently Plaintiff could not do manual work. He considered her prognosis to be "very bad."

On May 5, 2004, Dr. Policherla responded to a questionnaire on Plaintiff's condition (R.88-91). He first saw Plaintiff on October 10, 2003, and last saw her on April 19, 2004 (R. 91). Plaintiff had a 10% reduction in the range of motion of her neck and muscle spasms in the cervical and lumbar areas (R. 88). EMG studies showed lumbar and C5-6 radiculopathy. Plaintiff could walk, walk on her heels and toes, squat, climb stairs and get on and off the examination table. Although the questionnaire asked Dr. Policherla to describe any effect the pain Plaintiff experienced had on her activities and functioning, he did not respond, and merely drew a line through the space given (R. 90).

When Dr. Glowacki examined Plaintiff on May 14, 2004, he reported that she walked with a slight limp on the left lower extremity, could not squat or stand on her left

leg, was unable to walk on her heels and toes and could not heel to toe walk (R. 147). There was atrophy in the left thigh and knee flexion was reduced. Dr. Glowacki stated Plaintiff may need surgery, but that he hoped she would improve with the physical therapy he prescribed. He indicated she was unable to work and needed domestic help and a driver.

Beginning May 14, 2004, Dr. Glowacki began completing a series of forms that each indicated that Plaintiff was totally incapacitated and unable to work; further, they noted that she needed domestic help and a driver (R. 211-26). Taken together, these forms covered the period of time from May 14, 2004, through January 9, 2006.

At her May 18, 2004, physical therapy evaluation, Plaintiff was able to flex her left knee 145 degrees and extend it fully (R. 230). Strength in the lower left extremity was fair to good and Plaintiff walked with a mild limp on the left (R. 230-31). Her left patellar tendon reflex was diminished (R. 231). She had difficulty getting up from low chairs and from the floor. She measured her pain at five to six out of ten, which increased with ambulation (R. 230).

On June 16, 2004, Dr. Glowacki noted that Plaintiff walked with a slight limp on the left lower extremity, could not squat or hop, and could not walk on her heels and toes (R. 208). There was atrophy in the left quadriceps and hamstring. He suggested a brace and physical therapy as treatment, and indicated that she should continue off work.

On June 18, 2004, a state agency DDS physician completed a Physical Residual Functional Capacity Assessment (R. 178-86). He limited Plaintiff to lifting 20 pounds occasionally and ten pounds frequently (R. 179). She could stand and/or walk at least two hours in an eight-hour workday; sit for six hours in an eight-hour workday; and

could climb, balance, stoop, kneel, crouch and crawl only occasionally. She was not limited in her ability to push and pull. Though the DDS physician did not have access to the results of the MRI conducted on December 2, 2003, he noted that if indeed Plaintiff had torn ligaments in her left knee, it should fully affect ambulation and therefore he gave her a sedentary limitation (R. 180).

A June 21, 2004, physical therapy evaluation showed 145 degrees of left knee flexion and full extension (R. 227). Strength in the left lower extremity was fair and, although the left Achilles tendon reflex was within normal limits, the left patellar tendon reflex was slightly diminished. Plaintiff's gait was improving and she still showed limitations with getting up from lower surfaces (R. 228). She measured her pain at three out of ten (R. 227).

On July 26, 2004, Dr. Glowacki indicated that Plaintiff walked with a slight limp on the left lower extremity, had difficulty running and going up and down stairs, showed atrophy and weakness in the left thigh, could not hop on her left foot and could not walk on her heels and toes (R. 207). He reported that her knee clicked and gave way. He suggested a brace, physical therapy and exercises as treatment and again stated that she should continue off work.

At her August 25, 2004, appointment with Dr. Glowacki, Plaintiff complained of pain when walking. Forward flexion in her left knee was 100 degrees but was painful (R. 204). Dr. Glowacki stated that:

> I am afraid that degenerative changes settled in the knee and so far the repair of the anterior cruciate medial collateral ligament will not relive [sic] her pain but quite reverse [sic] it would make her knee more painful and stiffer. As it is right now, she is functional and I will continue physical therapy, Don Joy brace, and exercises and continue off work.

(R. 205).

On September 27, 2004, Dr. Glowacki examined Plaintiff and reported that her left knee was still unstable, though less so (R. 201). Wearing the brace improved her ambulation. He noted that she was "not able to work as she was before" and that if her condition did not improve with physical therapy, she would need surgery to reconstruct her knee.

Following a November 5, 2004, examination, Dr. Glowacki reported that, while her brace improved stability, it was causing her muscles to grow weaker, making walking more difficult. He stated that she should continue with physical therapy, but that "eventually in the future she will need reconstruction of the knee" (R. 199).

On February 28, 2005, Plaintiff demonstrated rotatory instability and her Lehman's test was positive (R. 197). Dr. Glowacki indicated that his present goal was to help her diminish her pain and keep her mobile. Although the brace and physical therapy were helping, she still needed domestic help.

Plaintiff continued to see Dr. Glowacki from April 2005 through August 2005. On April 11, with Plaintiff still complaining of pain in her knee and difficulty walking, Dr. Glowacki continued to advise physical therapy (R. 196). On May 18, Dr. Glowacki found atrophy in Plaintiff's left thigh. The June 22 examination showed atrophy in the left thigh; left knee flexion was 95 degrees (R. 195). On August 5, Dr. Glowacki continued to advise physical therapy and a brace.

In September 2005, Plaintiff rescheduled an appointment with Dr. Glowacki because she had undergone surgery that required her to stay off her feet. On September 14, 2005, Dr. Glowacki noted that the laxity was getting worse and that she needed

surgery (R. 193).  He reiterated that she needed surgery on an October 21, 2005, visit and

again on November 30, 2005:

> We discussed surgery many times but the guarantee could not be given
> and patient is afraid of complications and lack of guarantee that she would
> be cured of her condition.

(R. 190).  He indicated that her condition had not improved through physical therapy,

braces, or medications, but rather that it was deteriorating with time (R. 191).  Plaintiff

was developing post-traumatic osteoarthritic degenerative changes in her left knee and

was to remain off work.  On January 16, 2006, noting atrophy in Plaintiff's left calf as

well as in her left thigh, Dr. Glowacki again recommended surgery.

Dr. Glowacki completed a "Disability Certificate" on March 27, 2006, indicating

that Plaintiff had been on work disability since October 2003; he restricted Plaintiff from

lifting more than five pounds and from standing, sitting, carrying, walking or bending (R.

188).

## Evidence Received Following the Hearing[1]

Plaintiff continued to receive the physical therapy recommended by Dr. Policherla

from May 10, 2004, through September 8, 2004 (R. 251-77).  During that time period,

she had approximately 27 therapy sessions.

On August 2, 2004, Kathryn Smith, M.S.N., C.R.N.P., a nurse in Dr. Policherla's

office, noted that Plaintiff's headaches were stable, though she was still experiencing

---

[1] On April 21, 2007, Plaintiff's counsel, Mr. Watkinson, mailed additional medical
records to ALJ Graham (R. 242).  According to the date stamp on the letter, they were
received by the Office of Hearings and Appeals on Monday, April 24, 2006.  Three days
later, on April 27, ALJ Graham issued his decision (R. 11).  The records were not listed
on the exhibit list, but were made part of the record on August 25, 2006, by the Appeals
Council (R. 7).

upper and lower back pain, neck pain and muscle spasms (R. 249). Plaintiff complained

of pain when sitting or standing for 15 minutes. Her dizziness had improved. Ms. Smith

recommended that she continue with physical therapy three times a week.

The results of a March 17, 2005, EMG examination ordered by Dr. Policherla

showed bilateral C5-6 radiculopathy and bilateral L5-S1 radiculopathy (R. 248). Dr.

Policherla indicated the range of motion in her neck was decreased and she had cervical

muscle spasms (R. 244).

## 2. <u>Vocational Evidence</u>

VE Szydlowski characterized Plaintiff's past maid service work as unskilled and

light and her waitress work as semi-skilled and light (R. 301). ALJ Graham then asked

VE Szydlowski to consider the following hypothetical: a 42-year-old individual with a

12th grade education who can perform light work with mild pain; stand or walk two out

of eight hours; sit six hours out of eight hours; who would potentially be limited to entry-

level work; and who is limited to only occasionally climbing, balancing, stooping, or

crouching.[2] VE Szydlowski testified that, at the light level, there were jobs available as

_____

[2] The transcript shows a portion of the hypothetical scenario was inaudible to the court
reporter. It reads:

> Now, for purposes of the Claimant's, and I think this would just be potential
> entry-level work, assume she's 42 years old with a 12th grade education and
> can perform light work with mild pain, standing or walking 2 hours out of 8
> hours; sit 6 hours out of 8 hours and occasionally, climb, balance, stooping
> or crouching (INAUDIBLE) entry-level work, could she perform, and if so,
> what would the jobs be?

(R. 301). In his discussion of his hypothetical question in his decision, ALJ Graham
wrote that he "assum[ed] the claimant's age, education, work background and her
limitation to sedentary exertion with occasional climbing, balancing, stooping, kneeling,
crouching, and crawling . . . ." (R. 13).

assemblers (1,700 positions), inspectors (1,000 positions), packagers (1,500 positions), and counter clerks (2,000 positions) (R. 302). At the sedentary level, he testified that the full range of unskilled work would be available, and estimated that there were at least 20,000 of such positions in the region. Examples of unskilled sedentary work were information clerks, envelope stuffers, and mail workers (2,000 positions); inspector checker (1,000 positions); and security services jobs, including surveillance systems monitors and receptions (2,000 positions). Plaintiff's counsel then asked VE Szydlowski if he was assuming that the person in the ALJ's hypothetical could work an eight-hour day, five days a week without lost time and interruptions, and VE Szydlowski responded that he was (R. 303). VE Szydlowski then testified that the need to elevate a leg to heart level or higher for four hours out of eight hours would preclude employment. Lying down for two or three hours out of eight hours would also preclude employment.

### 3.   ALJ Graham's Decision

ALJ Graham found that Plaintiff met the disability insured status requirements on her alleged onset date, October 7, 2003, through April 27, 2006, and that she had not engaged in substantial gainful activity since October 7, 2003 (R. 14). Plaintiff had torn medial collateral anterior cruciate ligament and torn meniscus.

At the time of the decision, Plaintiff was 42 years old and had a high school education. She was unable to return to her past relevant work, and did not have any acquired work skills which were transferable to the skilled or semiskilled functions of other work.

Plaintiff had the residual functional capacity to perform sedentary exertion with occasional climbing, balancing, stooping, kneeling, crouching, and crawling. ALJ

Graham discounted Plaintiff's allegations of further limitations as not entirely credible (R. 13-14). He found that her daily activities were inconsistent with her allegations: although she testified that her sister did the household chores and that she only watched television, her Function Report indicated that, with the help of an attendant, she took care of her personal needs and her two-year-old son, and that she prepared food, shopped and enjoyed reading. Additionally, ALJ Graham noted that, at the hearing, Plaintiff wore a knee brace for walking and had no problems sitting. ALJ Graham also discounted Plaintiff's credibility because she refused surgery that could help her condition. While he acknowledged Dr. Glowacki's opinion, ALJ Graham observed that, because Plaintiff repeatedly declined surgery, Dr. Glowacki had no other choice than to restrict her from any manual work (R. 13).

ALJ Graham, using the Medical-Vocational Guidelines as a framework, together with the testimony of VE Szydlowski, determined that, though Plaintiff's lower extremity limitations did not permit her to perform the full range of sedentary work, there were a significant number of jobs in the national economy that she could perform (R. 15). Plaintiff was, therefore, found not to be disabled.

## II. ANALYSIS

### A. <u>Standards of Review</u>

In adopting federal court review of Social Security administrative decisions, Congress limited the scope of review to a determination of whether the Commissioner's decision is supported by substantial evidence. See 42 U.S.C. § 405(g); *Sherrill v. Sec'y of Health and Human Servs.,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence has been defined as "[m]ore than a mere scintilla;" it is "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Richardson v.*

*Perales*, 402 U.S. 389, 401 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S.

197, 229 (1938)). The Commissioner's findings are not subject to reversal merely

because substantial evidence exists in the record to support a different conclusion. *Mullen*

*v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147,

1150 (8th Cir. 1984).

If the Commissioner seeks to rely on vocational expert testimony to carry her

burden of proving the existence of a substantial number of jobs that Plaintiff can perform,

other than her past work, the testimony must be given in response to a hypothetical

question that accurately describes Plaintiff in all significant, relevant respects.[3]  A

response to a flawed hypothetical question is not substantial evidence and cannot support

a finding that work exists which the Plaintiff can perform.

**B.      Factual Analysis**

In her Motion for Summary Judgment, Plaintiff argues that her case should be

remanded for an award of benefits because she meets or equals the impairment listing

1.02(A).  Alternatively, Plaintiff argues that (1) ALJ Graham's failure to discuss how he

determined that she did not meet Listing 1.02(A) is reversible error; (2) the evidence in

the record showed that she suffered from the severe impairments of cervical and lumbar

---

[3] *See, e.g.*, *Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (hypothetical question must accurately portray claimant's physical and mental impairments); *Cole v. Sec'y of Health and Human Servs.*, 820 F.2d 768, 775-76 (6th Cir. 1987) (Milburn, J., dissenting) ("A vocational expert's responses to hypothetical questions may constitute substantial evidence only if the questions posed accurately portray the claimant's impairments."); *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987) ("The question must state with precision the physical and mental impairments of the claimant."); *Myers v. Weinburger*, 514 F.2d 293, 294 (6th Cir. 1975); *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975).

radiculopathy, and ALJ Graham failed to assess limitations relating to those impairments; and (3) her RFC was inaccurate because it did not include her need to lie down frequently and elevate her leg.

### Listing 1.02(A)

Plaintiff argues that she meets Listing 1.02(A) and that her case should be remanded for a computation of benefits. If "a claimant can show an impairment that meets the duration requirement (12 months) and is listed in Appendix 1 (the 'listings'), or is equal to a listed impairment, the ALJ must find the claimant disabled . . . ." *Gambill v. Bowen*, 823 F.2d 1009, 1011 (6th Cir. 1987). *See also* 20 C.F.R. § 404.1520(d) (2000). To meet a listing, a claimant "must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (emphasis added).

Listing 1.02(A) states:

*Major Dysfunction of a Joint(s) (Due to Any Cause).* Characterized by gross anatomical deformity (e.g. subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:

A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b . . . .

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.02(A). The definition of ineffective ambulation is provided in § 1.00(B)(2)(b):

(1) Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having

insufficient lower extremity functioning (see 1.00J) to permit independent ambulation *without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities* . . . .

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(B)(2)(b) (emphasis added).

Thus, in order to meet the listing, Plaintiff must demonstrate that (1) for at least 12 months, she had (2) gross anatomical deformity of one major weight-bearing joint; (3) chronic joint pain and stiffness; (4) limited motion; (5) medical findings of joint space narrowing, bony destruction, or ankylosis of the affected joint; and (6) inability to independently walk without the use of a hand-held assistive device that limits the function of both upper extremities. Because the car accident that resulted in her knee injury occurred on October 7, 2003, and Plaintiff was still seeking medical treatment for the injury at least until March 27, 2006, Plaintiff meets the duration requirement (R. 81, 188). Records from Dr. Glowacki indicate that Plaintiff has dysfunction of a weight-bearing joint, her left knee. Dr. Glowacki's records also demonstrate chronic joint pain, stiffness and limitation of motion, established by an MRI, which revealed a torn meniscus, damaged ligaments and degenerative knee changes (R. 154-55). Yet, the record does not show that Plaintiff suffered from ineffective ambulation as defined by § 1.00(B)(2)(b) because she did not require the use of a hand-held assistive device that limited the functioning of both upper extremities. Rather, Plaintiff was able to walk independently with the use of a knee brace (*see, e.g.*, R. 88, 147, 163, 176, 207). Further, Plaintiff indicated on her Function Report that she did not need a wheelchair, walker or crutches (R. 70).

Plaintiff argues that she met the criteria for ineffective ambulation, pointing to her testimony that she could only walk half a block, could not walk over uneven ground,

could climb stairs only by holding on to two hand rails, and needed a wheelchair when she did her Christmas shopping. This combination of limitations still does not constitute ineffective ambulation as defined by § 1.00(B)(2)(b). Furthermore, because of inconsistencies in the record, ALJ Graham found Plaintiff's testimony to be not entirely credible. An ALJ's "conclusions with respect to credibility should not be discarded lightly and should be accorded deference." *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1234 (6th Cir. 1993) (quoting *Hardaway v. Sec. of Health & Human Servs.*, 823 F.2d 922, 928 (6th Cir. 1987)). Here, ALJ Graham's finding is supported by the record and should be given deference. For example, in Plaintiff's Function Report, she indicated that she could walk up and down stairs wearing a knee brace; in addition, she did not check the box indicating she used a wheelchair (R. 70). Such inconsistencies with her testimony support ALJ Graham's conclusion that she was not entirely credible.

The medical evidence, therefore, does not show as a matter of law that Plaintiff satisfies the requirements of Listing 1.02(A). ALJ Graham could reasonably determine that Plaintiff's impairments did not meet or equal a listed impairment.

### *Lack of Analysis Regarding Listing 1.02(A)*

Plaintiff alternatively argues that her case should be remanded because, although she argued at her hearing that she met Listing 1.02(A), ALJ Graham did not analyze this specific listing in his decision. Rather, ALJ Graham merely concluded that "the objective medical evidence shows that [Plaintiff did] not have an impairment or combination of impairments that me[t] or equal[ed] the level of severity required by the Listing of Impairments in Appendix 1 of Subpart P, Regulations No. 4" (R. 12). He did not discuss the elements of Listing 1.02(A) and whether or not the evidence indicated

that Plaintiff satisfied those elements.

An ALJ does not have to discuss in great detail the basis for every finding he makes, but he "must adequately articulate the rationale for his conclusions in order to facilitate meaningful judicial review." *Williams v. Barnhart*, No. 05-CV-79107-DT, 2005 U.S. Dist. LEXIS 42030, at *7 (E.D. Mich., Oct. 24, 2005) (accepted by *Williams v. Barnhart*, 407 F. Supp. 2d 862 (E.D. Mich. 2005)). Yet, "there is no heightened articulation standard where the ALJ's findings are supported by substantial evidence." *Bledsoe v. Barnhart*, No. 04-4531, 2006 U.S. App. LEXIS 2692, at *8 (6th Cir., Jan. 31, 2006) (citing *Dorton v. Heckler*, 789 F.2d 363, 367 (6th Cir. 1986)).

ALJ Graham discussed the medical evidence, including Plaintiff's cervical and lumbar radiculopathy diagnosis and the degenerative changes in her left knee (R. 12-13). He indicated that his determination that Plaintiff did not have a listed impairment was based on that medical evidence. Thus, although he did not spell out how each piece of evidence factored into his decision, he sufficiently described the basis for his conclusion. Further, substantial evidence supports ALJ Graham's decision. As discussed above, the medical evidence shows that Plaintiff could walk without the use of a handheld assistive device and thus did not meet all the requirements of Listing 1.02A. The record does not support the opposite conclusion - Dr. Glowacki repeatedly noted that Plaintiff walked independently with use of knee brace. (*See, e.g.*, R. 88, 147, 163, 176, 207). With such substantial evidence in the record, ALJ Graham was not required to discuss in great detail the reasons Plaintiff did not meet the listing.

### *Cervical and Lumbar Radiculopathy*

Plaintiff next contends that her diagnosed condition of cervical and lumbar

19

radiculopathy should be characterized as a severe impairment.  She argues that the ALJ's failure to assess vocational limitations due to this impairment is reversible error.

Lumbosacral and cervical spine x-rays taken on October 7, 2003, showed evidence of mild degenerative disc disease in the lower thoracic spine, but normal intervertebral disc spaces and no lesions (R. 86).  An October 30, 2003 EMG, though, showed cervical and lumbar radiculopathy (R. 129-31).  A March 17, 2005, EMG showed bilateral C5-6 radiculopathy and bilateral L5-S1 radiculopathy (R. 248).

Even if a claimant has a diagnosable medical condition that meets the minimal threshold of being severe, she "must nonetheless establish that such condition is severe enough to be disabling." *Swann v. Chater*, No. 95-1678, 1996 U.S. App. LEXIS 19149 at *13 (6th Cir., July 19, 1996) (citing *Foster v. Bowen*, 853 F.2d 483, 488 (6th Cir. 1988)).  To show that she is disabled, therefore, a claimant must provide evidence of the effect her impairment has on her ability to work on a sustained basis.  20 C.F.R. § 404.1512.

Plaintiff's cervical and lumbar radiculopathy, although severe, are not sufficient to support a claim for disability.  She must also show that the condition has a disabling effect on her ability to work regularly.  Dr. Policherla noted that Plaintiff complained of neck and back pain, but when, on a questionnaire, he was given the opportunity to address the effect Plaintiff's neck and back pain had on her activities and functioning, he did not; instead, he drew a line through the question  (R. 90).  The DDS physician who reviewed Plaintiff's medical records considered cervical and lumbosacral strain to be Plaintiff's primary diagnosis; he noted the EMG results reporting cervical and lumbar radiculopathy and gave Plaintiff a sedentary limitation with the ability to climb, balance,

20

stoop, kneel, crouch or crawl only occasionally (R. 180). While ALJ Graham was in error in the failure to classify Plaintiff's cervical and lumbar impairments as not being severe, his residual functional capacity finding did accommodate these impairments as if they were severe. ALJ Graham did accept the DDS physician's opinion, and gave Plaintiff the RFC to do sedentary work with postural limitations that took into account her cervical and lumbar limitations, as well as her knee problem.

Therefore, the effects the radiculopathy had on Plaintiff's ability to work was included in her RFC. *See* 20 C.F.R. § 404.1527(f)(2)(i) (requiring the ALJ to consider opinions from agency physicians who are also experts in Social Security Disability); *Wyatt v. Sec. of HHS*, 974 F.2d 680, 686 (6th Cir. 1992). Based on the record and his credibility findings, he was within a reasonable range of discretion in not taking these limitations as disabling. His failure to label this condition as "severe" is not reversible error.

### *Need to Lie Down Frequently*

Finally, Plaintiff contends that ALJ Graham erred by not including in the RFC her need to lie down for four out of every eight hours. This argument fails because Plaintiff's claim is not substantiated by any clinical or other diagnostic findings. According to her medical records, her physicians and therapists never made this recommendation; the medical evidence does not even show that *she* mentioned it to *them*. Thus, Plaintiff's hearing testimony is the only evidence in the record of her need to lie down frequently and elevate her leg. Yet, as noted above, the ALJ discounted Plaintiff's credibility and his determination is given deference. ALJ Graham did not err in failing to include this complaint in his hypothetical question to VE Szydlowski.

### III.    RECOMMENDATION

For the reasons stated above, **IT IS RECOMMENDED** that Defendant's Motion for Summary Judgment be **GRANTED** and that Plaintiff's Motion for Summary Judgment be **DENIED**.  Either party to this action may object to and seek review of this Report and Recommendation, but must act within ten days of service of a copy hereof as provided for in 28 U.S.C. section 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981), *Thomas v. Arn*, 474 U.S. 140 (1985), *Howard v. Secretary of HHS*, 932 F.2d 505 (6th Cir. 1991).  Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation.  *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987), *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objection must be served upon this Magistrate Judge.

Note: any objections must be labeled as "Objection #1," "Objection #2," etc.; any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than ten days after service an objection, the opposing party must file a concise response proportionate to the objections in length and complexity.  The response must specifically address each issue raised in the objections, in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc.


Date: August 23, 2007                           s/Steven D. Pepe
Ann Arbor, Michigan                             United States Magistrate Judge

## CERTIFICATE OF SERVICE

I hereby certify that on <u>August 23, 2007</u>, I electronically filed the foregoing paper with the Clerk  Court using the ECF system which will send electronic notification to the following: <u>Lisa M. Watkinso, Esq., Janet L. Parker, AUSA</u>, and I hereby certify that I have mailed by United States Postal Service the paper to the following non-ECF participants: <u>Social Security Administration - Office of the Regional Counsel, 200 W. Adams, 30th. Floor, Chicago, IL 60606</u>

<u>s/ James P. Peltier</u>
James P. Peltier
Courtroom Deputy Clerk
U.S. District Court
600 Church St.
Flint, MI 48502
810-341-7850
pete   peliter@mied.uscourts.gov